## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIE POWER TECHNOLOGIES, INC.,   :
by PASCARELLA & WIKER LLP,      :     CIVIL ACTION NO. 04-282E
as Plan Administrator,             :

                            :

         Plaintiff,          :

                            :

        vs.                :

                            :

AALBORG INDUSTRIES A/S, a foreign  :
corporation, FREDDY FRANDSEN, an   :
individual, MICHAEL MILLER, an     :
individual, LARS BONDERUP BJORN,  :
an individual, JAN VESTERGAARD    :
OLSEN, an individual, and          :
CLAUS V. IPSEN, an individual,     :

                            :     JURY TRIAL DEMANDED

        Defendants.       :

## AMENDED COMPLAINT

Plaintiff, Erie Power Technologies, Inc. ("EPTI"), by and through its undersigned

counsel, hereby files the following Amended Complaint against Defendants:

### The Parties

1.     EPTI is an Ohio corporation, with an office and principal place of business

located at 5300 Knowledge Parkway, Erie, Pennsylvania 16510.  From July 1, 1998 through

September 27, 2002, EPTI was known as Aalborg Industries, Inc., and before that, as Aalborg

Keystone, Inc. (hereinafter referred to collectively as "EPTI").

2.     On August 29, 2003, EPTI filed a voluntary petition for relief under chapter 11 of

title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court (the

"Bankruptcy Court") for the Western District of Pennsylvania, Erie Division at Case No. 03-12126-WWB.

3.     On April 1, 2005, the Bankruptcy Court entered an Order confirming the Official Unsecured Creditors' Committee's First Amended Plan of Orderly Liquidation Dated February 22, 2005, as amended (the "Plan").

4.     Pursuant to the terms of the Plan, the firm of Pascarella & Wiker LLP has been named as Plan Administrator for the reorganized EPTI.

5.     EPTI brings this action in its own right, as well as on behalf of, and for the benefit of its creditors and the bankruptcy estate, and is duly authorized and obligated to do so under the United States Bankruptcy Code.

6.     Aalborg Industries A/S ("Aalborg") is a foreign corporation, with an office and principal place of business located at Gasvaerksvej 24, P.O. Box 661, 9100 Aalborg, Denmark.

7.     Freddy Frandsen is an adult individual.  Upon information and belief, he is a citizen of Denmark, with a business address of Gasvaerksvej 24, P.O. Box 661, 9100 Aalborg, Denmark.  At all times relevant hereto, Defendant Frandsen was President and Chief Executive Officer of Aalborg, Chairman of the Board of Directors of EPTI, and the owner of an equity interest in Aalborg.

8.     Michael Miller is an adult individual.  Upon information and belief, he is an American citizen, with a business address of 1400 McDonald Investment Center, 800 Superior Avenue, Cleveland, Ohio 44114.  Defendant Miller was a Director of EPTI and, at or during the same time, he also provided legal counsel and representation to both Aalborg and EPTI.

9.     Lars Bonderup Bjorn is an adult individual.  Upon information and belief, he is a

citizen of Denmark, with a business address of 41 DK-2450, Copenhagen, Denmark. At all times relevant hereto, Defendant Bjorn was employed by Aalborg and served as a Director of EPTI.

10.    Jan Vestergaard Olsen is an adult individual. Upon information and belief, he is a citizen of Denmark, with a business address of Gasvaerksvej 24, P.O. Box 661, 9100 Aalborg, Denmark. At times relevant hereto, Defendant Olsen served as a Director of EPTI and attended and participated in meetings of EPTI's Board of Directors at times relevant hereto during which he did not serve as a Director of EPTI. Defendant Olsen also served at the acting President of EPTI from August 7, 2001 through March 2002, and was employed by Aalborg at all relevant times hereto.

11.    Claus V. Ipsen is an adult individual. Upon information and belief, he is a foreign national or a naturalized citizen of the United States, who resides at 1475 Wintergreen Lane, Fairview, Pennsylvania 16415. From January 1, 2002, through September 27, 2002, Ipsen was the President of EPTI, and at times relevant hereto, attended and participated in meetings of EPTI's Board of Directors.

12.    Defendants Frandsen, Miller, Bjorn, Olsen and Ipsen hereinafter will be referred to collectively as the "Individual Defendants". References to the "Directors" or the "Board" refer to those defendants who were Directors or who as Directors collectively comprised EPTI's Board of Directors at the time relevant to the context in which the respective term is used. At all times relevant hereto, the Individual Defendants were under the direction and control of Aalborg, and acted solely and primarily in the best interests of Aalborg.

## Jurisdiction and Venue

13.    Several of the claims set forth herein arise out of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq*.  Accordingly, this Honorable Court has subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1334.

14.    Furthermore, this Court has supplemental jurisdiction over all additional claims set forth herein, pursuant to 28 U.S.C. § 1367.

15.    The claims and causes of action set forth herein arise out of acts and/or omissions that were undertaken by Defendants in this judicial district, and directly effected, or were known and/or intended to effect people, property and entities in this judicial district.  Accordingly, this Court has personal jurisdiction over these Defendants.

16.    Finally, venue for this action is proper in this judicial district, pursuant to 28 U.S.C. § 1409.

## Background

17.    EPTI was formed on or about June 12, 1997, in connection with the purchase by Aalborg of certain assets from Zurn Industries, Inc.  From at least June 12, 1997 through September 27, 2002, Aalborg owned all of the outstanding shares of stock of EPTI.

18.    EPTI is a global supplier of technology solutions and services to the power industry and selected energy-intensive industries.  In particular, EPTI designs, manufactures, assembles, sells and/or installs Heat Recovery Steam Generators ("HRSGs") for use in various commercial applications.

19.    It is commonly accepted and understood in the power and energy-related

4

industries that certain defects in the design and manufacture of HRSGs are unavoidable, despite the exercise of reasonable and appropriate care and diligence. Accordingly, it is necessary for companies that provide HRSGs, such as EPTI, to set aside or reserve a certain portion or percentage of the purchase price they receive from the purchaser or project owner, in order to be able to pay for corrective work orders and warranty work (the "Warranty Reserves").

20.    In consideration of the foregoing circumstances, it is also common in the power and energy-related industries for the owner and/or purchaser of an HRSG to withhold up to ten percent (10%) of the purchase or contract price, as security for any corrective work or warranty work that may be required (the "Retainage").

21.    Where the manufacturer or provider of an HRSG can provide a purchaser or owner with a letter of credit, however, that purchaser or owner may release the Retainage to the manufacturer. From 1997 until approximately 2001, EPTI regularly provided letters of credit to purchasers and project owners, in order to secure the release of Retainage and to support, maintain or augment its cash flow (the "Letters of Credit"). The Letters of Credit, *inter alia*, were backed by written guarantees from Aalborg.

22.    In or around 1997, Aalborg and EPTI entered into a contract, pursuant to which Aalborg agreed to provide certain "management" services to EPTI, in exchange for payment of a percentage of EPTI's net sales for the corresponding period during which those management services allegedly were rendered (the "Management Fee Agreement").

23.        Pursuant to the Management Fee Agreement, EPTI made the following payments to Aalborg (collectively, the "Management Fees"):

| Year | Management Fee |
| --- | --- |
| 1997 | $376,000.00 |
| 1998 | $598,212.50 |
| 1999 | $1,780,138.88 |
| 2000 | $777,712.80 |
| 2001 | $993,597.00 |
| 2002 | $666,666.00 |

24.   From approximately 1997 until some time in 2000, the power industry and energy-related industries were active and expanding.  As a result, the demand for HRSGs and EPTI's other products and services was high.  During that time, EPTI simultaneously was designing, manufacturing and/or installing several HRSGs under a number of different contracts or purchase orders, and for a number of different purchasers or owners.  During that time, EPTI also was a relatively profitable and viable entity, with regular and consistently positive cash flows.

25.   On or about January 1, 2000, Aalborg and EPTI entered into a Technology Licensing Agreement, pursuant to which Aalborg promised to provide to EPTI certain unspecified and unidentified proprietary and technical information, in exchange for payment of a percentage of EPTI's net sales for the corresponding period during which such information allegedly was provided to EPTI (the "Technology Licensing Agreement").

26.   Pursuant to the Technology Licensing Agreement, and after deduction of all appropriate credits and offsetting adjustments, EPTI made the following payments to Aalborg

(collectively, the "License Fees") without any evidence of any technology or information having been provided:

| Year | License Fee |
|------|-------------|
| 2000 | $2,688,114.91 |
| 2001 | $4,054,887.44 |

27. Beginning in or around 2000, the power and energy-related industries experienced a severe downturn in activity and economic performance. As a result, demand for services and products, such as HRSGs, evaporated and disappeared. EPTI subsequently received little or no new solicitations for bids, and few, if any, new contracts or purchase orders were awarded or issued to EPTI.

28. The aforementioned industry trend continued throughout 2001, 2002 and 2003. In particular, for example, EPTI did not receive any new contracts or purchase orders in the fourth quarter of 2001 or the first quarter of 2002.

29. Upon information and belief, the Directors and Aalborg recognized this industry trend, and its severe impact upon the profitability and economic viability of EPTI, as early as the Fall of 2000. As a result, Aalborg decided to extricate itself from EPTI's business, by selling or otherwise divesting itself of any interest in EPTI. To that end, *inter alia*, Aalborg commissioned KPMG to conduct a risk review of EPTI's business in November 2000.

30. The foregoing circumstances and developments impaired EPTI's cash flow and made it difficult or impossible for EPTI to pay debts as they became due. Aalborg was at all times aware of such matters, *inter alia*, through the Board -- many of whom were Aalborg's own direct employees and agents.

31.  Notwithstanding the facts that:  (i) the Directors (Frandsen, Miller, and Bjorn), and Aalborg were cognizant of the above-described industry trends and condition, and their negative impact upon EPTI, (ii) as of the fiscal year that ended in December 2000, EPTI had retained earnings of $7,865,000.00, and (iii) the amount budgeted for payment of dividends for the fiscal year ending in December 2000 was $2,225,000.00, the Board nevertheless authorized the payment to Aalborg of a dividend in the amount of $8,400,000.00.  Such vote in favor of a dividend that exceeded EPTI's retained earnings for the applicable year was cast by the Directors in April 25, 2001, and the dividend was paid by EPTI shortly thereafter.

32.  As EPTI's financial performance and condition continued to worsen, additional accounting issues and questionable business practices were discovered by EPTI, reported to the Board, and otherwise made known to Aalborg.  For example, on or about September 26, 2001, EPTI management reported to the Board (Frandsen, Miller, and Bjorn), at a meeting of EPTI's Board of Directors at which Defendant Olsen (then acting President of EPTI) was present and participated, that (i) the Warranty Reserve that had been set for the so-called "Shaw Piping" project was inadequate to cover the liability claims against EPTI for said project, and (ii) EPTI's cash flow was expected to decrease.

33.  Despite Aalborg's knowledge of the industry downturn and EPTI's worsening financial condition, in or around December 2001, Aalborg canceled or withdrew the payment guarantees it had made to EPTI or for EPTI's benefit with respect to the Letters of Credit, and otherwise terminated any and all support for those instruments.  This further impaired EPTI's cash flow, by hindering or eliminating EPTI's ability to recover several millions of dollars in Retainages and accounts receivable.

34. By January 2002, additional inadequacies were discovered with the Warranty Reserves. Accordingly, the total Warranty Reserves were adjusted between January and July 2002, from $7,562,329.01 to $12,325,392.55. The result of such adjustment was the further reduction in cash that was available to EPTI for operation and the payment of certain debts as they became due.

35. The aforementioned Warranty Reserve adjustment also demonstrated an awareness and acknowledgment by EPTI and the Defendants that the number of claims against EPTI was growing and/or was larger than previously known, and that EPTI's cash expenditures relating thereto were certain to increase substantially.

36. On or about February 8, 2002, at a meeting of the Board (Frandsen, Miller, and Bjorn) at which Defendants Olsen and Ipesn were present and participated, EPTI management reported on its efforts to replace the Letter of Credit that had been withdrawn by various banks and financial institutions as a result of Aalborg's above-described actions. Specifically, EPTI management informed the Directors that at least one of the banks to which EPTI had applied for Letters of Credit had expressed "concerns" about projections for the energy market and EPTI's history of dividend payments.

37. At that same Board meeting on or about February 8, 2002, EPTI management also reported to the Directors that: (i) the energy market has slumped; (ii) the risk of continuing to do business in that market is "above average", and (iii) EPTI's customers have advised that the demand for new HRSGs is extremely uncertain.

38. Notwithstanding the facts that: (i) the Individual Defendants (and Aalborg) were cognizant of the above-described industry trends and condition, and their negative impact upon

EPTI; (ii) EPTI was unable to access millions of dollars in accounts receivable, due to Aalborg'stermination of its guarantees for EPTI's Letters of Credit; (iii) EPTI's cash expenditures and claims against EPTI were increasing substantially; (iv) as of the fiscal year that ended in December 2001, EPTI had retained earnings of $6,599,000.00; and (v) the amount budgeted for payment of dividends for the fiscal year ending in December 2000 was *zero*, the Board nevertheless authorized the payment to Aalborg of a dividend in the amount of $6,000,000.00. Such vote in favor of a dividend that eliminated substantially all of EPTI's retained earnings for the applicable year was cast by the Directors on or about February 8, 2002, and the dividend was paid by EPTI shortly thereafter.

39. On or about March 28, 2002, EPTI's then President, Defendant Ipsen, essentially concluded that payment of the aforementioned $6 million dividend rendered EPTI insolvent. Defendant Ipsen communicated this opinion, in writing, to Defendant Frandsen. At the same time, Ipsen also advised Frandsen that the total amount of Retainages that could not be collected by EPTI because of its inability to obtain any Letters of Credit was at least $20 million.

40. Because EPTI was completely unable to meet its financial obligations to its various creditors, on or about April 23, 2002, Aalborg and EPTI entered into a written loan agreement (the "Loan Agreement"). Pursuant to its terms, Aalborg loaned $5 million to EPTI, at an interest rate of 4% per annum (the "Loan). The Loan Agreement further provided that all principal and interest were to be repaid in full by May 14, 2002.

41. On or about May 24, 2002, EPTI paid $150,000.00 to Aalborg, which Aalborg applied to outstanding principal on the Loan.

42. On or about August 28, 2002, EPTI paid $68,542.92 to Aalborg, which Aalborg

applied to interest on the Loan.

43. On September 27, 2002, EPTI paid an additional $2.5 million to Aalborg, which Aalborg applied to outstanding principal on the Loan (the "Principal Payment").

**Count I**
**Avoidance of Preference Payment – 11 U.S.C. § 547**
**Plaintiff v. Aalborg**

44. EPTI hereby incorporates by reference the preceding paragraphs of this Complaint, as though the same were set forth herein in their entirety.

45. The Principal Payment was:

    (a)    A transfer of EPTI's property;

    (b)    To Aalborg, as a creditor of EPTI;

    (c)    On account of a debt that EPTI has incurred prior to filing its Petition for Reorganization in the United States Bankruptcy Court;

    (d)    Made while EPTI was insolvent; and

    (e)    Made to an insider (*i.e.*, Aalborg) within the one year period before EPTI filed the aforementioned Bankruptcy Petition.

46. Furthermore, the Principal Payment enabled Aalborg to receive *more* than it would have received if EPTI had filed its Bankruptcy Petition under Chapter 7 of the United States Bankruptcy Code, the Principal Payment had not been made, and Aalborg were paid in accordance with said Code.

47. No new or additional value was given contemporaneously with EPTI's tender to Aalborg of the Principal Payment.

48. Moreover, the Principal Payment was not in payment of a debt incurred by EPTI

in the ordinary course of its business affairs with Aalborg, made by EPTI in the ordinary course of business between EPTI and Aalborg, or made according to ordinary business terms. To the contrary, on or about September 27, 2002, Aalborg orally directed Defendant Ipsen, who was then acting as EPTI's President, to make the Principal Payment. Defendant Ipsen thereafter complied with Aalborg's direction.

49. Finally, the Loan Agreement did not grant or convey to Aalborg any security interest or security for payments due thereunder.

50. Accordingly, Aalborg is liable to EPTI for the return of the Principal Payment.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendant, Aalborg Industries A/S, in the principal amount of $2.5 million, together with interest, attorneys' fees, costs, and such further relief as this Honorable Court deems appropriate.

## Count II
### Avoidance of Fraudulent Transfer – 11 U.S.C. § 548
### Plaintiff v. Aalborg and Ipsen

51. EPTI hereby incorporates by reference the preceding paragraphs of this Complaint, as though the same were set forth herein in their entirety.

52. Upon information and belief, Aalborg directed Ipsen and EPTI to make the Principal Payment, and Ipsen caused the Principal Payment to be made to Aalborg, with the actual intent to hinder, delay and/or defraud various entities to which EPTI was then indebted or subsequently became indebted.

53. Accordingly, Aalborg and Defendant Ipsen are each liable to Plaintiff for the return of the Principal Payment.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendants,

Aalborg Industries A/S and Claus V. Ipsen, in the principal amount of $2.5 million, together with interest, attorneys' fees, costs, and such further relief as this Honorable Court deems appropriate.

## Count III
### Uniform Fraudulent Transfer Act
### Plaintiff v. Aalborg

54. EPTI hereby incorporates by reference the preceding paragraphs of this Complaint, as though the same were set forth herein in their entirety.

55. As set forth in greater detail above, EPTI made several payments to Aalborg, specifically including:

    (a)    Management Fees in 2000, 2001 and 2002;

    (b)    License Fees in 2000 and 2001;

    (c)    Dividends in 2001 and 2002, for the fiscal years ending in December 2000 and 2001, respectively; and

    (d)    Payments of principal and interest with respect to the Loan (hereinafter, collectively, the "Aalborg Payments").

56. The Aalborg Payments were made to an insider.

57. At this time the Aalborg Payments were made, several claims by various third parties had been asserted and/or filed against EPTI.

58. Furthermore, the Aalborg Payments – especially the dividends and Loan payments – represented substantially all of EPTI's existing cash at the time such payments were made.

59. Additionally, the consideration given to EPTI by Aalborg in exchange for the Aalborg Payments – especially the dividends, the Management Fees and the License Fees – was not reasonably equivalent to the value of the respective Aalborg Payments.

60. Moreover, EPTI was insolvent when the Aalborg Payments were made. In the alternative, to the extent that any of the Aalborg Payments were made prior to EPTI being insolvent, such Aalborg Payments were made either when EPTI was engaged in business and/or transactions for which its remaining assets were unreasonably small in relation to such business and/or transactions, or when Aalborg, the Directors and EPTI intended, believed, or reasonably should have believed that EPTI would incur debts beyond its ability to pay as they became due.

61. Accordingly, upon information and belief, the Aalborg Payments were authorized by Aalborg, executed by EPTI's officers (including Defendant Ipsen), and made by with the actual intent to hinder, delay and/or defraud the creditors of EPTI.

WHEREFORE, Plaintiff demands judgment in its favor and against Aalborg in the principal amount of $26,299,521.07, together with interest, attorneys' fees, costs, and such further relief as this Honorable Court deems appropriate.

## Count IV
## Breach of Fiduciary Duty
## Plaintiff v. All Defendants

62. EPTI hereby incorporates by reference the preceding paragraphs of this Complaint, as though the same were set forth herein in their entirety.

63. At least during all times when EPTI was insolvent, Defendants owed various fiduciary duties to the creditors of EPTI, including, but not limited to the following:

(a) A duty to refrain from incurring greater debt or liability to such creditors, under circumstances where Defendants knew or reasonably should have known that EPTI was unable to satisfy such debts;

14

(b)    A duty to refrain from causing EPTI's assets to be wasted and/or

unreasonably depleted; and

(c)    A duty to refrain from diverting available assets to insiders.

64.    Defendants breached their fiduciary duties. As a direct and proximate result,

EPTI and its creditors incurred substantial damages and suffered severe harm.

WHEREFORE, Plaintiff demands judgment in its favor and against all Defendants,

jointly and severally, in the principal amount of $26,299,521.07, together with interest, attorneys'

fees, costs, and such further relief as this Honorable Court deems appropriate.

Dated:  August 12, 2005                            Respectfully submitted,

QUINN BUSECK LEEMHUIS
TOOHEY AND KROTO, INC.

Lawrence C. Bolla, Esquire, Pa. Atty. ID #19679
Nicholas Pagliari, Esquire, Pa. Atty. ID #87877
2222 West Grandview Boulevard
Erie, PA 16506-4508
Telephone: (814) 833-2222

and

Merrill G. Davidoff, Pa. Atty. ID #17729
Michael Dell'Angelo, Pa. Atty. ID #80910
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000

Attorneys for Plaintiff

15

**<u>Certificate of Service</u>**

I declare under penalty of perjury that I caused a copy of the Amended Complaint to be served on the following individuals by the method stated:

<u>Via-delivery to Court House box</u>:

Guy Fustine, Esquire
Knox Law Firm
120 W. 10th St.
Erie, PA 16502
Counsel for Defendants,
Aalborg Industries A/S, Freddy
Frandsen, Lars Bonderup Bjorn,
and Jan Vestergaard Olsen

<u>Via-Regular First Class mail</u>:

Christopher G. Kelly, Esquire
Holland & Knight, LLP
195 Broadway, 24th Floor
New York, NY 10007
Counsel for Defendants
Aalborg Industries A/S, Freddy
Frandsen, Lars Bonderup Bjorn,
and Jan Vestergaard Olsen

Robert A. O'Hare, Jr., Esquire
O'Hare Parnagian, LLP
82 Wall Street, Ste. 300
New York, NY 10005-3686
Counsel for Defendant
Clause V. Ipsen

Mark A. Williard, Esquire
Eckert Seamans Cherin & Mellott, LLC
600 Grant St., 44th Floor
Pittsburgh, PA 15219
Counsel for Defendant
Michael Miller

Dated:  August 12, 2005                    QUINN, BUSECK, LEEMHUIS, TOOHEY &
                                           KROTO, INC.


                                    By: _/s/ Lawrence C. Bolla_____
                                           Lawrence C. Bolla, Esquire
                                           Pa. Atty. I.D. #19679
                                           2222 W. Grandview Blvd.
                                           Erie, PA 16506
                                           Ph. (814) 833-2222
                                           Fax (814) 835-2076

                                           Attorneys for Plaintiff,
                                           Erie Power Technologies, Inc. by
                                           Pascarella & Wiker, LLP, Plan Administrator


Document #262753, v1